Pro Se 3 (Rev. 12/16) The Defendant's Answer to the Complaint

# UNITED STATES DISTRICT COURT

for the

Middle District of Florida

Tampa Division

)
) Case No. 8:25 cv 3362 TPB-AEP
) *(to be filled in by the Clerk's Office)*
)
) Jury Trial: *(check one)* ☒ Yes ☐ No
)
)

Jane Doe

_____
*Plaintiff(s)*
*(Write the full name of each plaintiff who is filing this complaint.
If the names of all the plaintiffs cannot fit in the space above,
please write "see attached" in the space and attach an additional
page with the full list of names.)*

**-v-**

Steven C. Messer

_____
*Defendant(s)*
*(Write the full name of each defendant who is being sued. If the
names of all the defendants cannot fit in the space above, please
write "see attached" in the space and attach an additional page
with the full list of names.)*

JAN 9 2026 PM1:27
FILED - USDC - FLMD - TPA

## THE DEFENDANT'S ANSWER TO THE COMPLAINT

### I.    The Parties Filing This Answer to the Complaint

Provide the information below for each defendant filing this answer or other response to the allegations in the
plaintiff's complaint.  Attach additional pages if needed.

Name                Steven C. Messer

Street Address      1626 Royal Forest Loop

City and County     Lakeland        Polk County

State and Zip Code  Florida        33811

Telephone Number    863 - 777 - 1655

E-mail Address      ☒    StevenMesser13@gmail.com

### II.    The Answer and Defenses to the Complaint

#### A.    Answering the Claims for Relief

On a separate page or pages, write a short and plain statement of the answer to the allegations in the
complaint.  Number the paragraphs.  The answer should correspond to each paragraph in the complaint,
with paragraph 1 of the answer corresponding to paragraph 1 of the complaint, etc.  For each
paragraph in the complaint, state whether: the defendant admits the allegations in that paragraph; denies
the allegations; lacks sufficient knowledge to admit or deny the allegations; or admits certain allegations
but denies, or lacks sufficient knowledge to admit or deny, the rest.

**B.    Presenting Defenses to the Claims for Relief**

Write a short and plain statement identifying the defenses to the claims, using one or more of the following alternatives that apply.

1.    The court does not have subject–matter jurisdiction over the claims because *(briefly explain why there is no federal–question jurisdiction or diversity–of–citizenship jurisdiction; see the complaint form for more information)*

_____

2.    The court does not have personal jurisdiction over the defendant because *(briefly explain)*

_____

3.    The venue where the court is located is improper for this case because *(briefly explain)*

_____

4.    The defendant was served but the process–the form of the summons–was insufficient because *(briefly explain)*

_____

5.    The manner of serving the defendant with the summons and complaint was insufficient because *(briefly explain)*

_____

6.    The complaint fails to state a claim upon which relief can be granted because *(briefly explain why the facts alleged, even if true, are not enough to show the plaintiff's right to recover)*

_____

7.    Another party *(name)* _____ needs to be joined (added) in the case.  The reason is *(briefly explain why joining another party is required)*

_____

    a.    If the basis for subject–matter jurisdiction is diversity of citizenship, state the effect of adding the other party:

The other party is a citizen of the State of *(name)* _____ .

Or is a citizen of *(foreign nation)* _____ . The amount of

damages sought from this other party is *(specify the amount)* _____ .

    b.    If the claim by this other party is based on an alleged violation of a federal constitutional or statutory right, state the basis:

## C.  Asserting Affirmative Defenses to the Claims for Relief

Identify an affirmative defense or avoidance that provides a basis for the defendant to avoid liability for one or more of the plaintiff's claims even if the basis for the claim is met. Any affirmative defense or avoidance must be identified in the answer. Include any of the following that apply, as well as any others that may apply.

The plaintiff's claim for *(specify the claim)*

is barred by *(identify one or more of the following that apply)*:

1.  Accord and satisfaction *(briefly explain)*

2.  Arbitration and award *(briefly explain)*

3.  Assumption of risk *(briefly explain)*

4.  Contributory or comparative negligence of the plaintiff *(briefly explain)*

Contributory Negligence of the Plaintiff
— see attached document —

5.  Duress *(briefly explain)*

C. Asserting Affirmative Defenses to the Claims for Relief

4. <u>Contributory Negligence of the Plaintiff</u> - The Plaintiff failed to exercise reasonable care to protect her own best interests, personal and professional reputation, and safety. That failures caused and/or contributed to the Plaintiff's injuries, made harm foreseeable under the "reasonable person" standard as the Plaintiff was most negligent in the posted internet sex videos of her prior to even knowing the Defendant. The Plaintiff did something a sensible person would not have done that helped cause her own harm. The Plaintiff had a duty to act responsibly to protect herself and failed to do that. The plaintiff failed to meet the standard of a "reasonable person" under the circumstances by participating in graphic sex videos posted to the internet. The Plaintiff's injuries were a reasonably foreseeable result of the plaintiff's lack of care. The Plaintiff is the featured performer in at least two more graphic and sexually deviant; homemade pornographic videos that were posted to the internet years prior to any of the photos and/or videos that are referenced in the Plaintiff's civil action as the cause of her damages that she has suffered and the basic reason for the Plaintiff's <u>Prayers for</u> <u>Relief</u>. The first video is titled <u>mature brunette hook up amateur milf gives blowjob</u>. That video was first posted on HClips on September 16, 2018 and still remains active. In addition, the Plaintiff performed analingus on the male partner after completing her third act of oral sex. The Plaintiff further stated to the young male that the analingus was "SUGARR!". After the Plaintiff finished her SUGAR, she asked the young male "wanna go for a ride?". When the male responded in the affirmative, the Plaintiff proceeded to jam her finger up his anus while the Plaintiff provided her fourth act of oral sex. There were also a lot of crude and crass actions like the young male emitting a loud OINK just prior to the Plaintiff going down for Act One. At the very beginning of the video just a few seconds prior to the loud OINK the Plaintiff stated "You got a big dick" to the young man. More evidence for the facts that support that the Plaintiff absolutely failed to take reasonable measure; the facts are that the Plaintiff took absolutely no measures to hide or even obscure her identity from the public. The Plaintiff is the featured performer in at least other much more graphic and sexually deviant homemade pornographic videos that are posted to the internet. The two videos were posted years prior to any of the photos and/or videos that are referenced in the Plaintiff's civil action.

Pro Se 3 (Rev. 12/16) The Defendant's Answer to the Complaint

6.    Estoppel *(briefly explain)*

7.    Failure of consideration *(briefly explain)*

8.    Fraud *(briefly explain)*

9.    Illegality *(briefly explain)*

10.   Injury by fellow employee *(briefly explain)*

11.   Laches (Delay) *(briefly explain)*

12.   License *(briefly explain)*

13.   Payment *(briefly explain)*

14.   Release *(briefly explain)*

15.   Res judicata *(briefly explain)*

16.    Statute of frauds *(briefly explain)*

_____

17.    Statute of limitations *(briefly explain)*

_____

18.    Waiver *(briefly explain)*

_____

19.    Other *(briefly explain)*

_____

**D.**    **Asserting Claims Against the Plaintiff (Counterclaim) or Against Another Defendant (Cross–Claim)**

For either a counterclaim against the plaintiff or a cross–claim against another defendant, state briefly the facts showing why the defendant asserting the counterclaim or cross–claim is entitled to the damages or other relief sought. Do not make legal arguments. State how each opposing party was involved and what each did that caused the defendant harm or violated the defendant's rights, including the dates and places of that involvement or conduct. If more than one counterclaim or cross–claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

1.    The defendant has the following claim against the plaintiff *(specify the claim and explain it; include a further statement of jurisdiction, if needed)*:

_____

2.    The defendant has the following claim against one or more of the other defendants *(specify the claim and explain it; include a further statement of jurisdiction, if needed)*:

_____

3.    State briefly and precisely what damages or other relief the party asserting a counterclaim or cross–claim asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons that are alleged to entitle the party to actual or punitive money damages.

Pro Se 3 (Rev. 12/16) The Defendant's Answer to the Complaint

a.  The defendant asserting the counterclaim or cross–claim against *(specify who the claim is against)* _____ alleges that the following injury or damages resulted *(specify)*:

b.  The defendant seeks the following damages or other relief *(specify)*:

## III.  Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this answer: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the answer otherwise complies with the requirements of Rule 11.

### A.  For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:  January 7, 3024

Signature of Defendant  _____

Printed Name of Defendant  Steven C. Messer

### B.  For Attorneys

Date of signing:  _____

Signature of Attorney  _____

Printed Name of Attorney  _____

Bar Number  _____

Name of Law Firm  _____

Street Address  _____

State and Zip Code  _____

Telephone Number     _____

E-mail Address     _____

United States District Court for the Middle District of Florida
Jane Doe v. Steven C. Messer
Civil Action No. 8:25-cv-03362-TPB-AEP

Defendant's Answer to the Complaint


1) Lacks Sufficient Knowledge to Admit or Deny - The Defendant does not know where the Plaintiff lives. Nor does the Defendant want to know where the Plaintiff lives. The Plaintiff is an extreme narcissistic sociopath whose every spoken word is a lie. The Plaintiff's litany of lies, creating a 'dream' woman to attract the Defendant, and now rampant slander in regards to the Defendant's mental health have created numerous problems for the Defendant; and, have been and still remain today very destructive and damaging to the Defendant's mental health conditions; comorbid BPD1/ADHD.

2) Admit

3) Lacks Sufficient Knowledge to Admit or Deny

4) Lacks Sufficient Knowledge to Admit or Deny

5) Lacks Sufficient Knowledge to Admit or Deny

6) Lack Sufficient Knowledge to Admit or Deny - The Defendant does not know where the Plaintiff resides nor does he want to know. The Defendant has waited almost eight years to rid himself of the wretched NSP Plaintiff. Every word, thought, or decision that is made is initiated with a lie when dealing with someone who has NPD narcissistic personality disorder. A NPD will never share their true intentions, and what NPD's are truly capable of doing to their victims. NPD's won't ever share that they intentionally seek out innocent, vulnerable, empathic, generous, or kind people because doing so makes them feel important. This sordid, sorry saga is a most bizarre fractured fairy tale that has invaded every aspect of the Defendant's life. How lucky can one man get to hit the 1 NSP out of 200 normal persons chances in the lottery. The Defendant knows now that there was no chance involved at all in his selection to be a victim because he perfectly fits the innocent, vulnerable, empathic, generous, and kind people criteria. Add mental health condition afflictions, gullibility, too trusting, naive, and very intelligent to the mix and the Defendant makes a  perfect recipe for a NSP's  shocking nefarious behavior that is intended to defile, dehumanize, and traumatize.

7) Admit

8) Deny - Defendant's name is Steven, not Stephen. The Plaintiff does not even know the Defendant's name after being engaged to him and residing in his home for more than two years. Not knowing the name of the Defendant in and of itself alone casts serious doubt in regards to the Plaintiff's credibility, honesty, intelligence; and the veracity of Plaintiff's latest 'get rich' scheme. The Plaintiff desperately needed a new 'get rich' scheme after the last one failed miserably without the help of the Defendant. The scheme that failed woefully was the Plaintiff's grandiose idea to blatantly rip-off of her former employer's business model after getting fired by her long term employer. The Plaintiff did not work closely with the professional community to create and market programming. In reality, the Plaintiff prior to being fired had been no more than a girl Friday type whose primary function was to schedule hotel rooms and rental cars for presenters at the training seminars. Moreover, once again the Defendant has never carried on or even been involved in any on-line campaign of any sort or manner at any place to harass the Plaintiff. Moreover, the Defendant has never been involved in any sort of plot, plan, or actual campaign at any time to harass the Plaintiff. If a person discovered that someone was engaged in a malicious, harassment campaign of any sort or manner that was designed to damage their professional and personal reputation, cause them severe emotional stress, and directly interfere with their professional and business interests; the Plaintiff does not understand why that  person would wait more than 2 years to start addressing a malicious harassment campaign as the Plaintiff did here in this instance. An absolute total lack of any urgency. An important sign that indicates this whacked out charade is just one more fractured fairy tale from the sick mind of a tried and true Narcissistic Sociopath if this entire  charade Waiting for more than 2 years to address any critical matter, like the Plaintiff has done here, is totally illogical and eliminates any sense of urgency on the part of the purported aggrieved person. Waiting more than 2 years, like the Plaintiff here wants people to believe, to address a malicious critical matter that is grossly invasive and causing severe emotional distress is sheer insanity. The first 2 points of emphasis made here in regards to the timing of the Plaintiff's charges are serious red flags which should raise a very serious concern for the credibility of an individual making such serious charges as the ones herein this suit. Now add to those two points of emphasis presented above that the Plaintiff knows that the malicious, hostile attacks that she attests to in a legal document are going to continue to occur regularly and in routine fashion for the next 800 days and continue to occur today. That pushes the bar well beyond a total lack of credibility and enters the realm of narcissistic sociopathy where every decision, word, or thought that is made is initiated with a lie when dealing with someone who has NPD narcissistic personality disorder. Narcissists never share several things, and the number one thing is the truth!

An individual with NPD never shares their true intentions, and what they're truly capable of doing to their victims. The Defendant conducted a considerable amount of research on mental health conditions after discovery of the horrible, wretched, vile acts perpetrated upon the Defendant to try to better comprehend what would compel a person even to think of such awful things to do to a fellow human being let alone act on such wretched thoughts. The Defendant hit the narcissistic sociopathy section; the Defendant understood then why he was a perfect candidate to be victimized by the Plaintiff. A few specific instances will be provided and fully detailed in the responses. Unfortunately for the Defendant, there were way too many more other instances than could ever be fully documented without writing a book. The worst thing that can happen to a narcissistic sociopath is to be exposed. The NSP is forced to confront the reality of their own deception, everything that the NSP has been hiding comes to the surface for everyone to see, and the facade that they have so carefully constructed begins to crumble. When their tools of deception no longer work, they can no

longer manipulate, hurt, use, and abuse others. So quite contrary to the charges levied herein, the Defendant has always been and still remains today the individual plagued by an on-going horrific, vicious, demented, twisted, sick, sexually deviant, extreme mentally and physically health damaging full-on narcissistic sociopathic assault, and last, but surely not the least; as displayed here in this civil action; now an on-going well thought out dastardly plot to drain everything and anything possible of any monetary value from the disabled Defendant including the $1300 cash that the Plaintiff stole from the Defendant's home in mid-February 2023. The Plaintiff began her campaign that has taxed and/or drained the Defendant's financial health, mental health, physical health, mental health management, overall well being, daily mental outlook, spirit, happiness, zest for life, former sterling personal and professional reputations, familial relationships, immediate family member's finances, and, even the Defendant's deceased father's estate, from the very first contact that the Defendant and the Plaintiff had on April 17th, 2018 on the dating site eHarmony. The Plaintiff printed the first few eHarmony conversations between the parties and gifted them to the Defendant with a pink stick-it note attached that read "I ❤ Steve". In researching files that the Defendant has kept since first suspecting that the relationship was born out of ill intentions from the very start, the Defendant came across the very first eHarmony text messages that he assumed were tossed out years ago. Looking back now at the first texts, the Defendant was complicit in the creation of his own problems that have now degraded his quality of life for almost eight years running. Unlike most normal people, the Defendant, who was diagnosed years ago with comorbid BPD1/ADHD, provided a crazy amount of the most sensitive personal information to the Plaintiff immediately. In the Defendant's very first message he stated that the only reason he was in eHarmony was to find "true love" as he now realized that the only thing that he had yet to successfully complete in his entire life was to "experience true love". The Defendant continued on unchecked to further arm the Plaintiff with critical information like the fact that he had stayed in a loveless marriage rife with adultery, dishonesty, and rampant lies by his former wife for over thirty years. The Plaintiff had expressed in her eHarmony profile that she was seeking what all narcissistic sociopaths seek the absolute most, that being a partner who was is very honest and always tells the truth regardless of the situation or the circumstances. So what most men may have seen as the devil in the details was seen by the Defendant as a 'dream' woman sent down from the heavens to compensate him for enduring thirty years of pure hell to make sure that his two children were raised properly. Not wanting to miss out on such a rare woman in today's world, the Defendant spilled his guts and told the Plaintiff the full extent of his own honesty. The Defendant laid it all on the line to let this 'dream' woman know his complete truths. The Defendant immediately proceeded to inform a woman that he didn't have one iota of real knowledge about at that time or even for the next few years that followed, that the Defendant was so honest that his honesty often got him in trouble personally and professionally. The Defendant went on to tell the Plaintiff that he had even been counseled by colleagues not to share so much of the truth. The Defendant finished by stating that those counselings had not stopped him from expressing the entire truth then nor would anything stop him now or moving forward in any relationship. The Plaintiff responded something like "Wow! That's so great that I had to go back and read that paragraph twice to make sure that I had read it correctly. We're going to have great chemistry when we meet". In closing on this charge, the Defendant has never been involved at any time in any harassment campaign of any sort or manner in his entire life against the Plaintiff or any other person for that matter. It is not even within the Defendant's innate nature given his diagnosed mental health conditions to to do anything that systematically and/or with any sense of planning. The Defendant has acted impulsively on practically everything that he has faced or accomplished in his entire life. Even when making decisions on matters of importance, the Defendant rapidly processes his knowledge of the matters and his own past life experiences in regards to similar matters and makes an immediate decision of the best approach to tackle the matter at hand. The Defendant also lacks the mental capacity, malice, spite, and vindictiveness to retaliate against the Plaintiff or anyone else. Most simply put, the Defendant has never felt that an act of retaliation serves any good. Thus, contrary to many other people's desire to retaliate or thirst for vengeance, the Defendant feels compelled to help his tormentors to make them better human beings moving forward. Does that strategy ever cause even more pain, damage, and problems for the Defendant. Heck yeah but as clearly detailed earlier the Defendant does not learn valuable life lessons like normal folks do. Regardless, the Defendant did not grossly invade the Plaintiff's privacy, damage her personal and professional reputation, cause her severe emotional distress, and/or directly interfere with her professional and business interests. The Defendant does not even know what the Plaintiff's professional and business interests are now nor did the Defendant ever know what the Plaintiff's true professional or business interests were when they first met because the 'dream' woman created by the Plaintiff to attract the Defendant was 180 % diametrically the opposite of the true realities of the Plaintiff. The Defendant does not have any knowledge or opinion in regards to what may or may not have occurred on October 23rd, 2023 or the days that led up to date and/or the days that followed that date that was at all related to the Defendant and/or the Defendant's participation occurred. Upon the knowledge discovered now by the Defendant in regards to the Plaintiff's true character, it is upon opinion and belief that the October 23rd, 2023 date is just one more lie, delusion, or narcissistic sociopath fantasy of the Plaintiff amidst dozens of others listed within in a very weak and feeble attempt to pin the blame on the Defendant for something the Plaintiff and her male NSA pals themselves did and had done multiple times before in regards to disseminating graphic on-line pornography involving the Plaintiff well prior to even knowing that the Defendant existed. So if the Defendant had to take an educated guess what actually occurred on October 23, 2023 based on prior knowledge and belief, the Defendant believes that one of the Plaintiff's porn site friends; NOT a potential client of a business that never existed, contacted the Plaintiff to inform her that he discovered whatever materials are being referred to in this suit. Moreover, the Defendant obviously never knew the Plaintiff's true interests given the damning materials that the Defendant discovered in early January 2021. Materials that provide concrete evidence of the Plaintiff's deviant sexual behaviors, true character, and total lack of morals and respect for social mores. It took the Defendant less than five minutes to discover the physical evidence that totally debunks everything that the Plaintiff told him about herself, her past, sexual history, and true interest in a relationship with the Defendant. Moreover, that same item that was easily discovered in the public domain of the internet debunks an overwhelming majority of the Plaintiff's purported problems listed within this suit that the Defendant purportedly created for the Plaintiff. Quite obviously, the problems listed were

created by the Plaintiff's own crass, crude, and way beyond lewd behaviors that are clearly displayed by the Plaintiff in a raunchy homemade sex video that the Plaintiff participated in of her own free will and volition that was created and posted to the internet at least 12 to 18 months prior to the Plaintiff even having any knowledge that the Defendant even existed. No person in their right mind and even a shred of dignity and self-respect would participate in such smut as the Plaintiff did on at least two separate occasions with different male partners that have been verified by physical evidence. Given the existence of the two verified videos there likely is the possibility of many more given the Plaintiff's true nature. The Defendant did not find any necessity or reason to discover more smut. The only purpose in the discovery process was to prove once and for all which is the crazy party as the Plaintiff made several ridiculous statements of slander in regards to the mental health status of the Defendant. And for the record, the Defendant was rather certain that he would discover evidence of the Plaintiff's true nature but the Plaintiff never expected that discovery would be made in less than five minutes from the start of the search. And, moreover, for the record, if the Defendant had not discovered any materials associated with the Plaintiff after a few days of searching, the Defendant would have immediately taken two measures. The first being to apologize to the Plaintiff if his suspicions were not verified. The second would be to check in with his mental health professionals for some serious talk therapy. Obviously neither of those items were required because the Defendant was spot on for his suspicions as he normally is 99.9% of the time because his suspicions are not easily raised. Literally someone needs to land three hard blows to the Defendant's face while he is driving in rush hour traffic to wake the Defendant up enough to realize that he has been lied to and serially abused for way too long.

The Plaintiff can not even get her 'Basic Facts' of this civil action correct. Worst, the vast majority of the Plaintiff's 'Basic Facts' are completely false or way off the mark in regards to dates that landmark events like an 'engagement' actually occurred.

9) <u>Deny</u> - Defendant's first long distance contact with the Plaintiff was on April 17th, 2018. A 'romantic relationship' developed in the first week of May 2018. The 'romantic' aspect of the relationship was not with the Plaintiff as I know her well today. A 'romantic' relationship ensued with the Plaintiff's 'dream' woman that was created and especially designed to strongly and swiftly attract the Defendant directly based upon the vast amount of sensitive, personal information that the Plaintiff unwittingly provided as detailed above in Item 8. The 'dream' woman created by the Plaintiff mirrored everything that the Plaintiff loved the absolute most in life and sought to share with a life partner. Prior to any 'romance', the Defendant did have a few suspicions that a woman this perfect may be too good to be true. Unfortunately for the Defendant, the blinders were firmly on by that point; and, naturally; the Plaintiff always had the perfect response to put the Defendant's mind at ease. The Plaintiff's act was so detailed and elaborate the Defendant became convinced that this 'dream' woman had been delivered by God as a heavenly reward for staying in a miserable marriage with an adulterous wife for over thirty years. The only reason the Defendant stayed was most honorable; to ensure that the Defendant's two children were raised properly and provided opportunities that the Defendant never had in life. The Defendant's 'dream' turned out to be the truly worst nightmare in the Defendant's life that continues to haunt the Defendant today almost eight years on.

There was <u>no</u> 'romantic' relationship with the Plaintiff from the time period of September 5th, 2019 until the Plaintiff and her son left the Defendant's residence a full calendar year later. Many times over the course of that year the Plaintiff would walk in on the Defendant pleasuring himself once even stating "my mouth is much better than Vaseline". The Plaintiff followed that up stating that if Defendant was interested in 'romantic' relations again all the Defendant had to do was say so. The Defendant had no interest at all as any shine on the Defendant's view of the relationship had worn off considerably after a year. That resulted from the large cumulative total of random odd comments that the Defendant started to track as detailed in #8 above. An especially telling fact is that what the Plaintiff had related to the Defendant in regards to the Plaintiff's sexual history was an absolute lie given that the Plaintiff informed the Defendant  that the Plaintiff was very inexperienced sexually and only had three prior 'romantic' relationships in her entire lifetime. Hearing no response to that comment from the Defendant; the Plaintiff went on to add without prompting that she had provided oral sex for just two men in her life because oral sex was a very special act for the Plaintiff. The Plaintiff continued on to identify those two men as her ex-husband Tom and her only 'Ken' (Barbie and Ken) type 'romantic' boyfriend that the Plaintiff had in her life. The Plaintiff first met her 'Ken' type as a client in her private massage practice located in the clubhouse at The Meadows. Given the Defendant's mental health disabilities, upon hearing the 'truths' of the Plaintiff states above; the Defendant immediately proceeded to fly from the dark depths of despair that had led the Plaintiff to make this one last attempt to find and experience true love to the highest of highs that only a heavenly sent 'dream' woman can provide! The behaviors and poor decision making skills in regards to the Defendant's personal matters directly result from the comorbid BPD1/ADHD mental health conditions that were diagnosed by a respected psychiatrist that has published books and professional articles on the subject matter. The Defendant tends to avoid or put off difficult or stressful situations, confrontations, exiting bad relationships, etc. The Defendant is extremely gullible and shares way too much personal information which compounds and complicates the Defendant's extreme gullibility. The Defendant gives anyone the benefit of the doubt even when serious 'red flags' exist that would make a normal person balk. The Defendant literally believes everything that the Defendant is told until a person's litany of lies have caused significant difficulties in his life. The Defendant has way too much empathy and kindness as most normal people would have booted the Plaintiff and her unemployable son Stephen out of their home at least a year prior to the actual departure. The Defendant does not learn valuable lessons like most other normal people do when they have been burned in similar situations in their past. Those simple facts debunk the perceived information and belief that the Defendant engaged in a campaign of any sort to retaliate for the Plaintiff's termination of 'romantic' relationship. Factually, a 'romantic' relationship had died a slow death by Spring 2019 a year prior to the Plaintiff departing the Defendant's home and long before accusations set forth here.

10. Deny - There is no primary component of an egregious and on-going campaign because there never was a campaign. And non-consensual publication of intimate images and videos of the Plaintiff and the Defendant would be impossible with the complete details as to why provided below in 11.

11) Deny - The initiation of taking and/or providing any nude and/or risque photos or videos in the relationship was initiated by the Plaintiff on dozens of occasions prior to even meeting the Defendant. In addition, all the photos and/or videos, like the videos where the Plaintiff slowly licked a single red popsicle while making racy statements such as the Plaintiff wished that it was the Defendant in her mouth instead of a popsicle, were provided to the Defendant without regards to any type of authorizations or permissions for any current or future possession of said materials. At the time the Plaintiff freely provided them without prompting. In spite of that fact, the Defendant never shared any of those materials with anyone either and the Defendant did not post any of those materials to the internet either. The point of making clear which party clearly initiated providing such materials in the relationship is very relevant. If the Plaintiff had not already readily supplied such materials on dozens of occasions without prompting that bridge would have never been crossed in the 'romantic' relationship.
There was never any discussion between the parties and/or authorization of possession of the photos or videos taken in the entire time period that such material was produced from early June 2018 at the Plaintiff's condominium in Sarasota to the very last sexual act between the parties' that occurred late in the afternoon of September 5th, 2019 at the Defendant's home in Connecticut. Any and all materials taken during the specified time frame along with the photos and videos provided by the Plaintiff prior to meeting the Defendant were stored on an antiquated desktop computer in an upstairs spare room in the Defendant's log cabin in Ashford, CT. This antiquated computer had no anti-virus protection for at least a decade by the time the first photos were taken and stored there. Storing all the photos and videos there seemed like the best option available in the home as it was the most secure spot to keep them private away from the Defendant's young grandson who often spent weekends at the cabin or any visitors who may have prying eyes. By coincidence at the time, the spare room upstairs in the cabin also provided the most privacy in the entire home. The Plaintiff utilized that desktop almost daily from early July 2018 just after relocating to Defendant's home until sometime in late December 2019 when the Defendant returned home from an extended hospitalization and subsequent rehabilitation after life-saving surgery to remove lethal blood clots. Now in light of this current civil action, the Defendant readily can see that there was no purpose for the Plaintiff to even to use that computer. The Plaintiff had a new high powered laptop that was much faster, easier to operate, and had up to date anti-virus protection installed. Regardless of Plaintiff's true purpose for using that antiquated desktop, the Defendant tends not to question anything due to his mental health conditions, the medical facts already mentioned. Moreover, to provide the Plaintiff unfettered access to the computer, the Defendant provided the Plaintiff his personal password for the desktop. The Plaintiff is the only other person to ever possess said password. The photos and videos stored on that computer remained unfettered, unbothered, and unknown to anyone else besides the Plaintiff and the Defendant for almost 18 months. At that point the Defendant discovered sometime, a few weeks probably, after returning from an extended hospitalization and subsequent rehabilitation that all the photos and videos in question had been removed from the desktop and any and all associated external hard drives used for additional storage. The fact that all the photos and videos taken during the 'romantic' relationship were removed during the Defendant's extended absence was of no bother or importance to Defendant then because the Defendant had moved on from any romantic inclinations for the relationship several months earlier. In addition, the Defendant had absolutely no future notions for 'romantic' relations with the Plaintiff either. The Defendant, in keeping with his nature to avoid any and all possible confrontation; did not even mention his discovery that the photos and videos had all been removed in his absence to the Plaintiff. The Defendant also did not ask the Plaintiff why she had removed any material from his personal computer without asking because again it seemed like removing the materials was of absolutely no importance back then. After a few weeks the Plaintiff likely either wondered why the Defendant had never mentioned the missing photos and videos or if the Defendant was harboring ill intent or was upset over the Plaintiff's actions; so the Plaintiff eventually asked the Defendant if he noticed that all the photos and videos that the two parties' had taken during the 'romantic' relationship had been removed from the desktop. The Defendant answered affirmatively upon which the Plaintiff inquired of the Defendant if he was upset by the Plaintiff's actions. The Defendant answered no, not at all. The Plaintiff then mentioned that she had permanently deleted all the photos and videos. The Defendant knows that to be a fact and the Plaintiff knows that to be a fact also. Obviously so, because the Plaintiff was the party who had indicated that she herself deleted all the materials permanently. At that time back then, the Defendant did not wonder if the materials had indeed been permanently deleted or even given much thought to the matter. The missing photos and videos were not a matter of importance for the Defendant by that time as any 'romantic' relationship had ended several months prior. The matter of what actually occurred to the materials when the Plaintiff removed them from the desktop seemed to be of no real concern or matter to the Defendant at the time. The only thing that did cross the Defendant's mind was to wonder if the Plaintiff actually did keep some photos and/or videos because the Plaintiff had a real strong preoccupation with the Defendant's small penis size and needled him often about it. For example, one time very shortly after moving into the Defendant's home the Plaintiff muttered verbatim "Poor you" when unzipping the Defendant's Levi jeans and looking inside. The Defendant still remains unsure whether the Plaintiff often made comments like this just to be mean and wicked or because the Plaintiff thought that the Defendant's long term tinnitus was so horrible that he couldn't hear anything at all. Regardless of the Plaintiff's intentions, the very last individual that the Defendant is aware of to have access to the photos and videos; to have possession of the photos and videos; and to ultimately determine what was done with the photos and videos was the Plaintiff. The Defendant was not even in the home when those actions were taken by the Plaintiff. The Defendant was still undergoing continuing medical care for lethal blood clots. In January '23 when the Defendant discovered the physical evidence of the Defendant's true character and nature, he did think back to the missing photos and videos and wonder if they were truly deleted by the Plaintiff or if the Plaintiff had kept copies of all or some of them to show her NSA sex pals the Defendant's small penis stature for one more good

laugh at the Defendant's expense. That stated now that the gullible Defendant had discovered that the incidents that were the most wicked and despicable acts that the Defendant and her regular NSA sex pals  perpetrated on the Defendant also involved photographs. Those photos being the ones that the Defendant had one or more of the NSA crew take intimate photos of her in provocative poses from at least three separate and distinct trysts during the last week of May 2018 just days prior to the Defendant flying to Sarasota for an extended stay at the Plaintiff's condo. The Plaintiff then proceeded to send these sick, demented photo sets to the Plaintiff later on in the same day that the photos were taken on two separate occasions and the next day following one especially late night romp that ended in the wee morning hours. So these three photo sets; and a few others taken earlier in the 'engagement' period; were sent to the Defendant in Connecticut as 'special gifts'. The final photo set taken on a Saturday prior to the Defendant's arrival in Sarasota was very obscene and disgusting. The photos were of the Plaintiff decked out in a well worn one piece crotchless white lingerie with the right breast hanging out  masturbating wildly on the floor with lecherous expressions. So given that history of the 'special gifts' photo sets and following the discovery of a much more obscene and disgusting video posted on the Internet; the Defendant immediately wondered much more seriously then and still does today if the Plaintiff truly deleted the photos and videos for good or kept copies for future ill intent given this coincident civil suit. So contrary to any information and belief, the Defendant did not even possess the materials that the Defendant is wrongly accused of posting to the internet after the Plaintiff removed them from the old desktop sometime in late November or in early December 2019. So to the best of the Defendant's knowledge, information and belief, the only parties that possessed said materials after all were totally removed from that vintage desktop are the Plaintiff, and/or a person or persons that the Plaintiff provided said materials to, and/or any person or persons who may have hacked said desktop with no anti-virus protection from the time period extending from mid-July 2018 when photos and videos were first stored there to sometime very late November 2019 or very early in December 2019 when the Plaintiff removed any photos and videos that I ever had in my possession while I was hospitalized. That same computer had been hacked several times before that and required repairs to get working again on two different occasions over that ten year time period.

    a) Deny - The defendant has no knowledge of the allegations. The Defendant has clearly pointed out at least twice already that the last individual to possess said items were the Plaintiff herself. Given her history and track record for deviant, sick 'surprises', it would be of no surprise to the Defendant at all if it were discovered that the Plaintiff herself posted whatever materials are referenced in this suit. Obviously, an individual twisted enough to send risque porn-like photos taken by other men during the course of NSA sex romps to her fiancee as 'special gifts' is way more than capable of posting photos and videos of herself especially to scam $200,000 from a decent human being that the Plaintiff has already run through her mill of hate and screwed with the Defendant's mental health of way more occasions than the Defendant can keep track of anymore. And there is nothing more despicable, vile, and evil than messing with someone's mental health. It takes a really rotten individual to scrape the bottom of the mental health conditions barrel.

    b) Deny - The Defendant has no knowledge of the allegations. Moreover, the Defendant is totally clueless as to what images are being referred to. The Plaintiff's face on the body of another woman? Huh? Really??

12) Lacks Sufficient Knowledge to Admit/Deny - The Plaintiff has absolutely no clue of what these three types of content are, where said content is posted, or whom posted such content; but can clearly state that whatever these three types of content are they were not posted by the Defendant as he once again states for the record that the Defendant did not post or publish any material in regards to the Plaintiff or anyone at all ever. Again the Plaintiff knows nothing about what this content is and lacks the skills to post the Plaintiff's head on another woman's body. That is a very strange accusation and again if any materials of the Plaintiff were indeed posted anywhere the Defendant is inclined that said materials were posted by the Plaintiff herself as she is very familiar with the use of porn sites just ask the Hamilton, Ontario bugged eye crazy that proudly holds a sign declaring himself drlongcock12 on Pornhub. The Plaintiff is most familiar with the doctor of Pornhub love. Obviously, the Plaintiff will deny that fact but if the Plaintiff takes and passes a lie detector test by a reputable third party examiner agreed on by both parties in regards to her knowledge of the doctor, the Defendant will give her $2000 cash no questions asked after he repays his son who will need to loan him attorney fees to defend this case as currently the Defendant has no funds and doesn't even have a vehicle anymore because it was totalled in an April car crash in Lakeland.

13) Deny - I never disseminated any NCII content nor did I consent for any person including Junker to disseminate NCII content with me.

14) Deny - I was unaware of the publication of any NCII content until being served with this suit on December 19th, 2025.

15) Deny - Despite anyone's information and belief I never published any NCII content. It is not possible to publish materials that I have not possessed since late 2019 anywhere at all let alone on hundreds of websites and internet platforms. An outlandish narcissistic sociopathic lie. Period! The Plaintiff must believe that the Defendant has absolutely nothing going on in his life to have the ridiculous amounts of time that it would require to post anything hundreds of times on hundreds of sites. Well trust the fact that the Defendant's time is way too precious to waste hanging out on porn sites like the Plaintiff did while supposedly working at my residence for the CEU training company that fired the Plaintiff and for very good reasons I would believe based on the discoveries that I have made in regards to the Plaintiff. The Defendant is most aware that all narcissistic sociopaths are in love with themselves and think everyone else loves them too. Well the Defendant has no love for sick, vile, deviant persons and would not waste the time of day on any of them so, NO, the Defendant does NOT waste his valuable time on porn sites nor does he or did he ever post anything on porn sites.

16) Deny - The Defendant is not aware of this NCII content or what it even consists of. Nor has the Defendant searched for said content after service as the Defendant has absolutely  no interest at all in seeing the Plaintiff in any more pornographic materials. The Defendant has seen more than enough deviant pornography of the Plaintiff to verify the suspicions that the Defendant harbored in regards to the Plaintiff's true character and total moral decay. Said verification was critical for the Defendant's mental health and to

put to rest the Plaintiff's litany of lies and perjury put forth in legal documents of the Illinois court system. Further, the only pornography that the Defendant is aware of, and that was three years ago now, is the 3 minute 42 second video of the Plaintiff giving a much younger imbelic man child five complete bouts of oral sex, with a bout of analingus tossed in after the third ejaculation, the Plaintiff refers to analingus as "Sugarrr" in the video, and an anal fingering during the fourth blowjob which the Plaintiff refers to as "wanna go for a ride?" Upon information and belief and viewing statistics provided on one particular site that features the Plaintiff's video; that particular video starting the Plaintiff has been viewed millions of times since first posted and the video is the third most viewed video ever in the Amateur Mature Woman - Blowjob category. And, yes one more time here, that video was posted at least 12-18 months prior to the Defendant and Plaintiff's first contact. Further, given that a second voice edited version of the video exists clearly signifies that the Plaintiff had at least a certain amount of involvement in the final disposition of the video in preparing a second version for posting to the internet. Clearly, the Plaintiff has some very serious history and experience in internet porn and needs to stop blaming innocent victims for the huge mistakes that she made freely of her own violation. And if the Plaintiff was not involved in the posting of the smut video then clearly the only other party to have possession was the male participant who was filming the video. So if this individual was responsible for posting that God awful video then why isn't he being sought out for posting videos of the Plaintiff? Or did the Plaintiff provide implicit permission to post her smut on the internet? Regardless, if it is not the Plaintiff herself posting whatever materials are being referred to in this suit then the Defendant feels strongly that this other male participant should be looked at for posting whatever materials are posted according to this suit as obviously that person would already be a known individual who had posted the Plaintiff's sex materials already again unless the Plaintiff provided implicit permission to post or assisted him in the posting of the video. And for the sake of God, the Hamilton, Ontario crazy was actually selling the video of him and the Plaintiff titled drlongcock12 gets a blowjob on ModelHub, a subsidiary of Pornhub. The Defendant has absolutely no doubt that the Plaintiff was the individual who had the good doctor removed their video from both Pornhub and Model Hub when she finally realized that it was rather simple to locate her pornography on the internet if a person knows the critical key words to search. Less than five minutes to discovery; it took the Defendant almost five full days to discover material of his ex-wife when she too lied outrageously and messed with the Defendant's mental health. The Defendant can not express any more strongly not to mess with anyone's mental health. That is no different than abusing a child or abusing a helpless animal. All three of those acts are as low down and dirty as it gets.

17) Deny - see previous responses.

a) - Deny - Absolutely no knowledge of this accusation. It is bizarre, beyond belief, and very damaging to the Defendant's personal and professional reputations. No more than very serious slanderous libelous Jerry Springer show type nonsense. The Plaintiff really needs to get a life and some very serious professional help along with it and stay off porn sites. Did the Plaintiff already state the fact that the very first weekend that the Plaintiff visited at the Defendant's residence the Defendant caught the Plaintiff in the midst of searching porn sites on his personal laptop. Yes, indeed the Defendant did on a Sunday morning just prior to driving her to Bradley Airport. Crazy enough is the first thought that flooded the Defendant's head was the Plaintiff has porn on the internet somewhere and is trying to see if the Defendant ever goes to that site? Crazier yet is the Plaintiff got up out of bed and retrieved the Defendant's laptop out of a closet to snoop porn sites while the Plaintiff was making her breakfast downstairs. So imagine the Defendant coming back upstairs to just say hi for a moment because he is so full of joy only to find that essentially a strange woman, at that point and still today too btw, was snooping porn sites on his laptop. So the Defendant stated what the heck are you doing with my laptop and why are you on porn sites? Despite the fact that the Defendant's original suspicion came true in shining colors a few years later that day the Defendant let the Plaintiff off the hook with her very feeble excuse that one of the doctors; presenting for the company the Plaintiff still worked at back then prior to being fired, discussed how men who look at porn too often eventually become incapable of getting an erection. Laughable back then and still today but again the Defendant ignored way too many red signals that would have made most men walk away and walk away very swiftly at that.

b) - Deny - Absolutely no knowledge of this accusation. Again it is bizarre, beyond belief, and very damaging to the Defendant's personal and professional reputations. No more than very serious slanderous libelous Jerry Springer show type nonsense.

c) - Deny - Absolutely no knowledge of this accusation. It is bizarre, beyond belief, and very damaging to the Defendant's personal and professional reputations. No more than very serious slanderous libelous Jerry Springer show type nonsense.

d) - Deny - Absolutely no knowledge of this accusation. It is bizarre, beyond belief, and very damaging to the Defendant's personal and professional reputations. Utterly a total waste of the Defendant's time and totally moronic from a low educated person.

e) - Deny - Absolutely no knowledge of this accusation. It is bizarre, beyond belief, and very stupid. Waste of time period, get real!

18) Deny - see above. Total made up crap. The Defendant does not even know where the Plaintiff went to school and sure as hell doesn't have a mock up of the Defendant's license. Really, so guess the Defendant must be guilty of forging state identification cards too eh as drlongcock12 would state! And that's a real mouthful eh? The only party to have an actual driver's license of the Plaintiff is the Plaintiff herself so again evidence points to the Plaintiff as publishing her own photos much like the filthy, nasty smut videos long before the Plaintiff knew this Defendant.

19) Neither Deny or Confirm - I have no knowledge of this subject matter. The only knowledge I have of similar matters is that the Defendant trolls internet sites as HubbardDorisX, take the test Doris, please take the test to prove the truths of the matter. Betting Doris won't anyone else in? This material is so low brow gutter pig trash. Totally false and sloppy slander. And, yes, the Plaintiff picked up at least two different men that are now verified by physical evidence off porn sites while residing at the Defendant's home rent free with a deadbeat son in tow who didn't work one honest day in two years. No great surprise that the Plaintiff was fired given that she trolled porn sites for me to blow. The Defendant fails to understand how the Plaintiff is harassed sexually when in actuality the Plaintiff trolled porn sites for sex while engaged and residing scott free in her fiancee' beautiful home. And seriously, this woman

lugged around an industrial size bottle of Listerine everywhere that she went. The Plaintiff had figured that one out hence his total lack of desire to have sex with a disgusting nasty slob. And btw real nice job raising the kids Doris!

20) Deny - Total F'ING lie. Total and unequivocal lie. The Defendant never indicated in the least bit of one iota that he would continue to disseminate intimate images if not paid tens of thousands of dollars. Call it like it is total BS crap and the attorney who drafted this crap should be disbarred for vicious lies, libel, and slander. What is wrong with her? She thinks it's okay to viciously attack someone for tons of crap he never did. Oh some one needs to be held most accountable for this crap as it's got way too deep. Sick and demented lies and half-truths. In actuality the photos sent once to her mother and once to her younger brother were not taken by the Defendant. Oh no, not at all those two photos were part of the 'special gifts' photos sets the Plaintiff had other men take of her during their regular NSA flings to send to her freaking fiancee as 'special gifts' really? Sick as one gets  and the Defendant is certain that most jurors will be totally shocked and appalled that any human being is that f'ck in the head. It takes a very sick mind to even consider perpetrating such acts on any human being let alone actually perpetrating such vile acts on a fiancee! A fiancee who treated her like a queen and lavished gifts and trips to places that the Plaintiff had never experienced while the numerous other men in her life took her like the pig that she is! A person has to be utterly brain dead and totally bereft of oxygen to the brain, as the Plaintiff claimed the very much more intelligent than Doris and her f'ck friends all piled together on top of each other in the pig pen. Any woman who thinks that being taken night after night by pigs from the internet, after becoming engaged even, is an accomplishment to be proud of — wow just wow – wow wow and how now brown cow eh? So again the Defendant never demanded any money from Doris' family, the Defendant simply let them know what Doris had skipped out on cause Doris and her deadbeat son would have been kicked to the curb immediately had this horrific behavior come to light while residing in the Defendant's home. The Defendant may be naive, trusting, gullible, kind and have way too much empathy but the Defendant does not hang out with scum nor would he allow scum to reside in his home under any circumstances let alone rent free. And just like there was never discussions on possession of photos that the Defendant hasn't seen for at least six years anyways; there was also never discussions that Doris and her braindead son could reside rent free either. The Defendant expected Doris to pay her own way especially after there was no 'romantic' or 'real' relationship anymore and of course Doris told massive lies about her son prior to moving him in too. So again the Defendant never stated in any form or manner that he would continue to disseminate intimate photos of the Plaintiff if not paid tens of thousands of dollars by her family. Total inane BS lies, if anyone wants to see the actual REAL letters that the Defendant wrote to a couple of Doris' family members this Defendant would be more than happy to share them because these wicked lies have gone way too far and way too long unchecked. This Defendant can't wait to get in front of a juror of his peers and let them determine just who is the aggrieved party in this sick and sordid fairy tale spun by one HubbardDorisX. The Defendant believes the jury will see right through Doris' web of lies. So again the Defendant can't continue what the Defendant never started so he never threatened to continue disseminating photos because the Defendant never disseminated photos to begin with. As indicated earlier the two photos provided to Doris' mother and brother were not vile smut but what they actually were and the Defendant's purpose in sending them was to simply return the 'special gifts' that Doris routinely blessed the Defendant with on many occasions to a place and persons  better suited to have these 'special gifts' from their fellow family member. And, hell no again biatch the Defendant did not distribute any NC WTF content at all let alone broadly. Please do your own internet discovery like the Defendant did to discover the truth and the truth is Doris' distributed her own NC WTF content broadly prior to meeting the Defendant. Wake up to reality why do ya think Doris was snooping porn site on a laptop she removed from a closet. Probably damn good reasons for that and the primary one would be that Doris was well aware of the magnitude and extent of her smut porn widely across the internet long before meeting the Defendant and Doris was trying to find out if her fiancee frequented sites where Doris knew her own material could be found. Doris could have just asked the Defendant instead of snooping and he would have provided the answer which is hell no. The Defendant stated earlier that he does not waste valuable time trolling porn sites.

21) Deny - How many more times does the Defendant need to State the blatantly obvious that there was NEVER any campaign. So accordingly, since there was never a campaign then there is no intent for anything plain and simple! Do the simple among us here clearly understand that by now as the Defendant has spent days responding to total nonsense, much of it almost comical if not so serious of a matter.

22) Deny - No, not at all true. The truth for Doris is that, unfortunately, her OWN efforts to be an internet porn star were way beyond the success that the Plaintiff expected. To have the third highest viewed porn video in the amateur mature woman - blowjob category is the porn world's equivalent of winning the bronze medal in the Women's Downhill in the Winter Olympics. So should the Plaintiff have expected any less attention from the award winning performance that Doris provided for whack jobs across the globe. C'mon the Plaintiff was like a 57 or 58 year old woman at the time that the Doris counterpart that lies deep inside the Plaintiff literally decided to tackle the job at hand; well tackle the five jobs and ancillary acts I reckon. Doris needs to look in the mirror, take responsibility, and own her own decisions and actions and stop trying to cast blame at innocent parties. Nobody but Doris herself caused damage to the Plaintiff. Is the Plaintiff really that ignorant of social mores and taboos? Any woman starring in a filthy, disgusting porn video like the Plaintiff did should have expected to become an outcast of society. Her internet peer group is not mainstream society, those folks are pious pigs and leeches. Own Doris, the jury awaits your sordid saga.

23) Deny - No knowledge of any campaign. FU can't continue something that was never started and please stop speaking for me as you are well beyond an ignoramus at this point already. The Defendant knows there was never any campaign and there never will be any campaign or continuing campaign. Yes, hold the responsible party accountable then that will be twice in her life that the Plaintiff has been held accountable for her uncontrollable sickness to f'ck with good people! Does the Plaintiff and her NSA gang still find this crap funny? It's not, not in the least.

The Defendant has discovered and possesses evidence that the Plaintiff participated in much more graphic sexual activity than anything that the Defendant would have ever imagined in his absolute worst nightmares. Activity so graphic and disgusting that the

Defendant got physically ill the first time that he viewed the entire video thinking that he was actually engaged to marry that woman featured in the video. That most damning physical evidence of the Plaintiff's true character and total lack of any morals appears to have been first published on the Internet about six months prior to the Defendant's first contact with the Plaintiff. The Defendant has observed that same video and a second same video with altered voice-overs by both participants in the video on several sites. Despite anyone's information and belief, the Defendant has not engaged in said behavior and never plans to engage in said behavior. Furthermore, the Plaintiff is the individual that should be held accountable for her horrific acts that severely damaged the Defendant, Defendant's immediate family; and permanent damage perpetrated to the Defendant's mental health conditions and the continuing successful management of said mental health disabilities.

Furthermore, what this suit fails to acknowledge upon information and belief is that the Plaintiff was held accountable for one of her actions. The State of Florida charged the Plaintiff with assault and battery for striking the Defendant three times hard to the face while the Defendant was driving during rush hour on I-4 South. The State Attorney left open an option to possibly charge the Plaintiff with assault and battery on a disabled person instead of the final formal charge of simple assault and battery. If the Defendant truly wanted to retaliate against the Plaintiff for ending a 'romantic' relationship that did not exist for over a full calendar year prior to her claims or anything else at all for that matter, the Defendant would have obviously pursued the higher charge. The charge of assault on a disabled person, which the Defendant is clearly classified as by both the State of Connecticut and the federal government, carries a minimum prison sentence of five years imprisonment. All that was necessary for the State of Florida to continue to consider the higher charge was for the Defendant to obtain a statement from the Defendant's physician regarding his current mental health condition at that point in time. That request to obtain an updated mental health status statement would have been real simple for the Defendant in addition to the many multiple files of diagnoses and past history that already are in the possession of the Defendant. As the Defendant indicated here the Defendant has way too much empathy and kindness. Defendant's decision on charges to pursue for the assault and battery imparted upon him by the Plaintiff, who holds a black belt in karate, was very simple in spite of the physical assault and battery and the many other atrocities and acts of cruelty committed by the Plaintiff and her NSA male sex pals. The Defendant's only response to the State Attorney was a thank you for the State of Florida's work efforts and the consideration of the assault on a disabled person charge; however, the Defendant did not want to see the Plaintiff or anyone of similar age or condition imprisoned for a minimum sentence of five years. Defendant stated that all he wanted was for the Plaintiff to observe that people are accountable for their actions. That may be the first time in the Plaintiff's life that she had been held accountable for damaging the lives of others. This is some kind of sick game for the Plaintiff and the 0.5% percent of the world's population who are similarly wired to actually thrive upon the chaos and destruction created in the lives of way too many people who are unfortunate enough to cross paths with such an individual. Upon information and belief, the Defendant's first thought when this suit landed at his door during the peak holiday season and the day that his beloved mother passed was that this suit is a last gasp desperate large money grab because the Plaintiff was probably totally broke and apparently she was. Also, after being fired by her long term employer that provides CEU training to physicians; the same employer who generously gave the Plaintiff an opportunity to re-enter the workforce after her divorce, what did the Plaintiff proceed to do? The Plaintiff, often bereft of original thought during her relationship with the Plaintiff, decided that getting fired by her long term employer despite whatever the reasons were presented a perfect opportunity to do one of the things that the Plaintiff excels at and all persons wired similarly to the Plaintiff derive great pleasure in doing. Exacting the ultimate revenge on anyone that dares to hold the Plaintiff responsible for her own actions and making sure that the foolhardy individual who did hold her accountable pays the highest price possible. Thus, the Plaintiff concocted a scheme to  convince her former employer's paid physician presenters to work for her in a new start-up business identical to her former employers. And yes, despite the false claims here in, the Plaintiff's plot of creating and owning a business by decimating her former employer was a miserable failure all on its own accord without any help and/or involvement of the Defendant. A total and unequivocal bust right from the start without involvement from the Defendant. The Plaintiff conveniently fails to mention that she canceled her first two scheduled training seminars due to insufficient funds long before the Defendant had any involvement at all. As a matter of fact when the Defendant learned that the Plaintiff already had made a last minute cancellation of the first training seminar that was scheduled for Key West, Florida due to insufficient funds available to pay for the facilities and presenters and was about to make a last minute cancellation of the second training seminar that was scheduled to be held in Bar Harbor, Maine also because of insufficient funding; the Defendant asked the Plaintiff what her current funding shortfall was? The Plaintiff was considering the offering of a short term loan so the second training seminar could proceed as the Defendant knew and informed the Plaintiff that canceling one such training seminar for patrons like physicians is very risky for even a well established CEU training company and most likely a death toll for a brand new unproven start up company. And if a single last minute cancellation in a business that provides CEU credits to physicians is a death toll just imagine how lethal two consecutive last minute cancellations impacted the Plaintiff's unproven start-up concept. Upon hearing that the Plaintiff indicated that she would require at least $20,000 to hold the second training event. After serious consideration and discussions with his two adult children, the Defendant determined that it would be too foolhardy even for his rash decision making processes to risk the entirety of his funds at that time as the Defendant has no assets at all. Furthermore, upon  information and belief, this suit besides being a huge desperate money grab is pure retaliation against the Defendant for pursuing the State of Florida assault and battery charges. What could be better than for an individual like the Plaintiff to have a grand last gasp opportunity to kill two birds with one stone? Practically nothing but I'm sure that if any individual could scheme up a better opportunity it would be either the Plaintiff or an individual similarly wired.

24) Deny - A most simple example that I can easily provide here regarding the truth and this baseless suit is the Plaintiff fails to even get the 'Basic Facts' of her own civil action correct; and the Plaintiff fails miserably at that. It is quite obvious that the Plaintiff must not know when we met in 2018 but it's remarkable that the Plaintiff states that both parties resided in Connecticut. As stated several

times by the Defendant, the Plaintiff resided in a condominium at The Meadows in Sarasota, Florida when the Plaintiff and the Defendant first met. Moreover, the Plaintiff had been a long term resident at The Meadows.

25) <u>Deny</u> - This fact is so far-fetched it would be comical if this suit were not such a serious matter for the Defendant and his family now and in the future. The true facts are beyond embarrassing to the Defendant but the true facts provide the ultimate, absolute proof of tendencies already stated about the Defendant's gullibility, trust, etc. So embarrassingly enough the Defendant actually proposed to the Plaintiff in very late **May 2018** on the very first weekend that the Plaintiff and the Defendant first met in person! The actual proposal took place on a Saturday night just prior to taking the Plaintiff, well in actuality the 'dream' woman that the Plaintiff created especially to strongly and swiftly attract the Defendant to the Chowder Pot in Hartford, Connecticut to treat her to the KING OF THE TANK lobster! The Defendant stated verbatim to the Plaintiff "I'm not going to get on my knees and I don't have a ring; but will you marry me Diane?" The Plaintiff immediately responded yes with a qualification that the Plaintiff wanted to call her two sons first to ask their permission. The Plaintiff then gave the Plaintiff a beautiful silver engagement 'bracelet' that was tastefully adorned by engraved angels. Being the beyond impetuous, gullible fool that the Defendant is most often and especially when blinded to the truth, the Defendant also gifted the Plaintiff a gorgeous pair of black pearl earrings to boot. So moreover, it is quite obvious that despite anyone else's totally false information and erroneous beliefs, the Plaintiff did NOT begin residing with the Plaintiff in December 2019 and the two parties did not get engaged in December 2019. The 'romantic' relationship had long run its course by very early 2019. Moreover, sometime in that same time period of Spring 2019 the Defendant made it very clear to the Plaintiff that he no longer planned to marry and that his log home was going to be bequeathed to his two children. That stated the Defendant always looking out for everyone else best interests instead of his own best interests did inform the Plaintiff that if she alone, not with any of her children or another male partner, wished or needed to continue to reside in his residence that he would make any legal arrangements needed to ensure that the home could not be sold as long as the Plaintiff resided there and paid for utilities and maintenance expenses. There was a clear change in demeanor when the Plaintiff learned that she would not be inheriting the beautiful log home and that a marriage was not necessary. And as indicated already by the Defendant here in; the Plaintiff began residing with the Defendant in the Defendant's Ashford, CT home on **July 3rd, 2018** after driving a 24 foot rental truck with the Plaintiff's life belongings from her residence in Sarasota. It's unfathomable to the Plaintiff that the Defendant's 'Basic Facts' not only miss a critically 'important' life changing event date for most people, an engagement, and a most unusual and untypical engagement at that, but this Plaintiff misses the actual date by more than 18 months! That 'basic fact' is quite remarkable given that the 'romantic' relationship lasted 12 months at the very most, the 'romantic' relationship was long over by the December 2019 'engagement' date stated by the Plaintiff in her suit, and the Plaintiff was informed about nine months prior to this ridiculous date that there was no longer even going to be a marriage. How the Plaintiff could not even know these basic facts is befuddling when the Defendant treated the Plaintiff like the 'dream' queen that the Plaintiff created during 2018. The Plaintiff also always made a point of showing off her beautiful engagement 'bracelet' to practically anyone that was encountered in our travels. The Defendant's most vivid memory of that is from July 2018 when a young lady working in a fashionable gift shop on Main Street in Bar Harbor was absolutely floored by such a late life love story!

26) <u>Deny</u> - The Defendant never asked the Plaintiff if he could take risque photos and/or videos of her at any time. As indicated here in this document twice already the Plaintiff was the individual who initiated providing nude photos and risque videos of herself on numerous occasions prior to any photos or videos taken. The Plaintiff was always more than willing to eagerly participate, even on the very first occasion that photos were taken at her residence in Sarasota, FL during the first week of June 2018. The Plaintiff loved to pose for any type of photo. Earlier in the responses it is evidenced that Junker had posed for risque and nude photos for other men that same exact week **prior** to the Defendant's arrival at her FL residence.

27) <u>Deny</u> - Upon the Defendant's information and belief, consent can not be given to a request that was never asked.

28) <u>Deny</u> - Upon the Defendant's information and belief, consent can not be given to a request that was never asked. Regardless, the Defendant did not disseminate any images or videos of the Plaintiff or any other individuals to any third party or anybody else for that matter. Nor would the Defendant ever consider such an action.

29) <u>Deny</u> - This particular query I find remarkable. I believe that it was drafted in a most sneaky and despicable manner lest the cat 🐈 get out of the bag in regards to the real truths of the Plaintiff. Please note that in this query, and in this query ONLY, there is NO mention of CONSENT. No consent at all; not for providing consent for taking and/or not for providing consent for disseminating said risque subject matter by anyone else. That is a critical point as Junker is well aware that I discovered an outrageous much more crude video of Junker. Junker is easily identified as the woman in the video. Junker even pulled her hair back prior to providing oral sex on five distinct occasions in a short video that is just 3 minutes and 42 seconds in the version that cuts out Junker's final proud statement of "Well, how did I do?" to the male participant. The simple act of pulling her hair back to reveal her entire face and certain facial expressions that I also observed from Junker on rare occasions is brazen sheer stupidity. Maybe Junker thought that the measure of pulling her hair back would help to 'protect' her reputation? Upon information and belief I can attest to the fact that Junker's former husband also confirmed that the woman in that outrageously obscene video is indeed Junker after he requested the location of the video so he could view Junker's wild sexual histrionics while providing five acts of oral sex in less than four minutes total just like the millions of others who have viewed the video.

30) <u>Deny</u> - As previously indicated any 'romantic' relationship was over by late Spring of 2019 and all sexual activity had ceased due to the Defendant's total lack of interest by very early August 2019. Thus, any romantic interest and all sexual activity had ceased well prior to the Plaintiff's 'Basic Facts' engagement date of December 2019. It is a fact that the Plaintiff and her son moved out of the Defendant's residence in September 2020. However, the Plaintiff and the Defendant only remained platonic friends for about two years, not the next several years.

31) Deny - Upon true basic facts the Plaintiff did not visit the Defendant in September 2022 in Florida. As a matter of further true basic facts the Plaintiff did not visit the Defendant at any time or at any place during 2022. At this point of reference in this baseless suit the Defendant had not even seen the Plaintiff since she departed the Defendant's residence in September 2020 after sitting in the Defendant's driveway with her vehicle running for about 50-60 minutes. The Plaintiff only departed after the Defendant noticed her situation and went outside to make sure that the Plaintiff was well and didn't require assistance.

The truth is that the Plaintiff texted the Defendant in mid-November to alert the Defendant to her forthcoming visit to Florida. The Plaintiff expressed a desire to meet up and visit at the new home that the Defendant's son had purchased a year prior. The Defendant responded in the affirmative and the Plaintiff provided the Defendant the exact date in early December 2022 to expect her arrival. The Defendant scheduled the date in his phone calendar. The Plaintiff rarely does that because his memory never fails him. There have been a few occasions over the course of the Defendant's life when he temporarily lost track of a certain item. That is not commonplace but when it has occurred it is a result of thoughts regarding more critical issues that require the Defendant's attention have temporarily flooded the Defendant's normal thought processes.

Given that and because the Defendant attempts to never appear rude or even aloof to others, the Defendant scheduled the date to ensure that the Defendant was available on the date that the Plaintiff provided. The Plaintiff failed to show and did not even attempt to call to alert the Defendant not to wait around all day for a no show. The Defendant rarely even get upset over anything let alone angered as the Plaintiff accuses the Defendant of in the next item #32. The Defendant was bothered early in that evening by thoughts of being totally blown off without notice after waiting the entire day for the Plaintiff. So the Defendant texted the Plaintiff and got no response. The Defendant then determined that the Plaintiff must be running late for some reason and was still traveling to Florida. So the Defendant called the Plaintiff to request an update and the Plaintiff didn't answer. The Defendant waited about another hour before texting and calling again. The Defendant got no response again. Then the same was repeated about a half hour later with no response. At that point the Defendant then decided that it was as good a time as any to alert the Plaintiff about the looming suspicions that he had been having in regard to the truth, the Plaintiff's past relationship history and the suspected lack of fidelity on the part of the Plaintiff. The suspicions began shortly after the Defendant read the Facebook message from the Plaintiff's former German NSA suitor. Normally the Defendant would not be interested and/or bothered by any of the three items listed above but the Plaintiff and Defendant 'romantic' relationship was not normal in many instances and ultimately turned out to be in way much more types of crass instances than the Defendant would have ever imagined back then in November 2022. A particular event that had occurred before a 'romantic' relationship even ensued is what bothered and constantly nagged at the Defendant. When the Defendant first visited the Plaintiff in early June of 2018 he broke down on a Sarasota beach as he informed the Plaintiff why the Defendant was so hesitant to enter another 'romantic' relationship. That event was most critical to the Defendant as it directly resulted from the rampant infidelity, habitual lies, and constant accusations and attacks on his mental health conditions by the Defendant's ex-wife. Her claims that it was the Defendant who was the 'real' problem in their marriage. That the Defendant was the crazy one, that the Defendant was mentally ill, that the Defendant needed serious psychiatric help, that the Defendant imagined rampant infidelity and affairs, etc. Constant accusations that like those listed above here that were completely lies contrived to mess with the Defendant's mental health conditions from a 'romantic' partner, hurt the Defendant and the Defendant's mental health much, much more than when the Defendant discovered the concrete physical evidence of his ex-wife infidelity was readily available to view right on the internet. So given the physical verification of everything and much more that the Defendant had ever thought in regards to the lack of trust, the lack of the truth, and rampant infidelity in his marriage; the Defendant decided after his divorce in 2014 that it was highly unlikely that he would ever have a 'romantic' relationship again in his lifetime. So now what the Defendant once thought to be improbable and most likely impossible for him to ever broach again was actually right on the cusp of imminently occurring! So now looking back in hindsight, the Plaintiff decided to embark on what was the absolute worst thing that anyone could provide to a person wired like Junker. Yet, prior to agreeing to enter a 'romantic' relationship this measure was absolutely necessary and immediately required for the Defendant to make any comments. So lying on a Sarasota beach the Defendant proceeded to promptly inform the Plaintiff of even way more personal information than he had already foolishly provided almost immediately to the Plaintiff during daily late night long telephone conversations. The Defendant totally broke down crying when he related to the Plaintiff that another 'romantic' relationship that was based on lies or had any infidelity occur would literally kill him physically and mentally. Heaven sent a 'dream' woman created by the vivid narcissistic sociopathic 'imagination' the Plaintiff immediately assured the Defendant verbatim that "then you absolutely will not have any problems if you enter a relationship with me!" The Plaintiff informed the Defendant that she had only three prior 'romantic' relationships in her life. With no prompts the Plaintiff added that she had provided oral sex for just two men in her entire life because oral sex was a very special act for her. The Plaintiff identified those two men as her ex-husband and her only 'Ken' (Barbie and Ken) type 'romantic' boyfriend that she had ever had in her life. 'Ken' was met as a client in her private massage parlor business located in the clubhouse at The Meadows. Quite obviously given my mental health conditions I immediately proceeded to fly from the darkest depths of despair to the highest highs that only a heavenly sent 'dream' woman can provide for a man! Upon information and belief and provided with concrete physical evidence of the true facts and serious consequences that occurred in the 'romantic' relationship despite the Plaintiff's promises and pledges during that critically important 'honest' discussion at the Saroata beach; I do believe that any rational person may have been a bit bothered that evening. For the record I did not ask the Plaintiff who she had been "sleeping with" nor did I care who the Plaintiff may or may not be "sleeping with" at that point in time long after the 'romantic' relationship had ended. The ONLY thing I cared about back then and still NOW are the significant damage and long term setbacks in successful management of my mental health conditions that would result if my suspicions in regards to the real truths of a short term 'romantic' relationship and the lies set forth from the Plaintiff in regards to herself and her past 'romantic' relationships were indeed true. In regards to Junker's two man/three man tall tales; when I told my

daughter the tall tales she stated "C'mon Dad really? You're way smarter than to believe such foolish crap from ANY woman that age!"

32) Deny - The Plaintiff never indicated any such statement because the Defendant never had "ex-partners" except his ex-wife. Further, it was impossible for Junker to be aware of "harassment" because "harassment" is one thing that did not occur from either party before, during, or after our marriage. The only knowledge that the Plaintiff was 'aware' of in regards to the Defendant's marriage is the total and absolute truths that the Defendant shared with her that day at the beach. That very personal information was provided to the Plaintiff then only in an attempt to prevent any repeat of any of the poor behaviors that were fully detailed above. Unfortunately for the Defendant, that attempt to prevent gas lighting, habitual lies, and infidelity back then at that time and still remains today the absolute worst failure of the Defendant's entire life. And now as a direct result this suit is full of lies, twisted distortions, and half-truths at best. Again please note that given the hardships that the Defendant has already unnecessarily suffered at the hands of others it is literally impossible for the Defendant to be 'angered' despite any information and belief!

33) Deny - The truth of this matter was previously detailed. There was no visit in Florida in September 2022. Nor was there any visit at any place or at any time during the entire calendar year 2022. The truth of this purported item #33 is that the Defendant awoke to discover a text message from the Plaintiff the next morning after sending text messages the previous night in regards to suspicions that the Defendant had in regards to the Plaintiff. Chiefly, the suspicions that raised major concerns to the Defendant were related to horrible experiences in the only long term 'romantic' relationship that the Defendant had ever had. A relationship that was sour throughout and ended poorly as already described. So in priority order the Defendant's main concerns were that despite the fact that the Plaintiff was provided with way too much sensitive personal information from our first contact through eHarmony; and, much worse is that despite the fact that the Defendant was totally broken to the point of brawling in front of a woman that he barely knew and in reality never truly knew, and that is a total understatement now, the Plaintiff assured the Defendant that if the main problems associated with the Defendant's hesitation to enter a new 'romantic' relationship were infidelity, lack of honesty, lack of morals and societal mores, chronic habitual lying, gas lighting, and intentionally messing with mental health conditions in any form or manner then the Defendant would have absolutely no problems if he did elect to enter a 'romantic' relationship with this Plaintiff. So essentially, the Defendant's chief concern was to safeguard his mental health conditions from any potential abuse that was intentional or from chronic repeat episodes of unintentional episodes. A quick summary of the Plaintiff's text that was received the day after raising suspicions is that the content was littered with lies and false accusations regarding the Defendant's mental health status. The Plaintiff diagnosed the Defendant as totally mentally ill and in need of serious mental health assistance if the Plaintiff truly believed any of the concerns that the Plaintiff had expressed in his text messages. One must wonder what the Plaintiff's mental health diagnosis of the Defendant would be today knowing that all his concerns and suspicions barely scratched the surface of much more damning evidence of deviant sexual activity that can be easily verified on many internet sites. It is very obvious to any person who has viewed her video that the Plaintiff is clearly the star actress. Furthermore, the Plaintiff can be easily identified because the Plaintiff pulled back her hair to clearly display her entire facial features, and the Plaintiff fully displays an exact same distinct Japanese tattoo on the Plaintiff's upper back identical in size, shape, and location of the woman in said video. The Plaintiff can also be seen clearly throughout the video without obscuring, covering, or even making it more difficult to see clearly distinctive obvious identification features. Most amateur women who participate in similar home sex videos posted on the internet appear to have been accorded any and all readily available measures to assist in preventing potential identification of themselves prior to posting videos for public consumption. The Plaintiff most likely can also be identified by some of the more intelligent, astute men for whom she has provided oral sex. There are  certain fairly unique distinct physical actions; and, moreover, several certain fairly unique distinctly outrageous facial expressions of the Plaintiff when attempting to totally unequivocally impress a new 'romantic' partner. And to be much more fair and truthful than certain information and beliefs here that said video and the less easily found accompanying voice altered video in which the Plaintiff states "Well, how did I do?" just after the male 'romantic' partner ejaculated in the Plaintiff's mouth for the fifth and final time in a three minute and 42 second video. And being much more honest, fair, and open to hearing the true information and belief of the individual that actually posted the crude and crass homemade sex video that the Plaintiff starred in prior to even knowing that this poor fool Defendant even existed in this cold, cold world. The truth by anyone's information and belief is that the crude homemade sex video could only have been posted to the internet by the Plaintiff, the Plaintiff's 'romantic' partner in this video, both parties together especially given that there is a second after the fact voice altered version, and/or a person who received this video directly from one and/or both of the participants.

33) Deny - A friendship of any sorts was called into an extremely concerning status mode for me very shortly after I discovered the Facebook message. A message that the entire content, simply put, was an unapologetic, yet quite contrary to boot, weak, and feeble plea to the Plaintiff for serious consideration and subsequent approval for reinstatement to an active NSA status once again. That in and of itself totally debunked at least 95% of everything that the Plaintiff told the Defendant that made the Plaintiff so attractive to the Defendant. The Defendant would have had absolutely no interest in even casual dating if any woman even remotely had a past sexual history like the Plaintiff let alone a woman like the one the Plaintiff displays is in her crass sex video. Life is way too short and this Defendant's life is way too complicated already without having to deal with such awful behavior in any relationship let alone a 'romantic' relationship. It should be well noted however that had the Plaintiff been honest with the Defendant from when the two parties first met the Defendant would have absolutely no problems or issues at all in being platonic friends. The Defendant is sure that he would also have been more than ready to help or assist the Plaintiff in any manner necessary if the Plaintiff requested help. The major portion of what the Defendant once thought was a sincere platonic 'friendship' was totally debunked after the Defendant verified the real truths of a short and not so sweet 'romantic' relationship by discovering concrete physical evidence of the real truth. The real truth is that any sort or manner of 'relationship' never existed as everything was based on lies and perverse fantasies. Then well after the wicked, perverse acts perpetrated by the Plaintiff finally came to light in the first week of January 2023;

any semblance of friendship deteriorated immediately upon learning that the Plaintiff's response to the Defendant's legitimate concerns regarding the 'romantic' relationship was to falsely label and slander the Defendant in legal documents by stating that the Defendant was totally insane, in immediate need of serious psychiatric help, and had brain dysfunction due to the total deprivation of oxygen due to blood clots. Those false, libelous statements made by the Plaintiff in legal documents have put the Plaintiff at serious risk for considerable monetary damages for the extreme damage that the Plaintiff  has done to the Defendant's long standing great public reputation. A reputation that once was based on more than thirty years of assisting the public in obtaining the safe and adequate public drinking water supply that was needed to maintain and support the public health of thousands of persons, many stuck in long term horrible situations that had been deemed for decades by predecessors as 'impossible' to resolve. The main reason said situations were deemed impossible to resolve was due to the fact that my predecessors had no imagination, no ability to think outside of the box let alone the intestinal fortitude required to act outside the box, and most critical was an intense paralysis born by fear of simply publicly speaking the truth in instances. Fear of supporting the most helpless among us and those without the means to resolve long standing contamination and water shortages on their own accords. That once great public reputation was created for the most part by being born with mental health conditions that despite the occasional well intended faux paus by the Defendant that cause detrimental effects only for the Defendant himself. Those same mental health disabilities provided the Defendant with vision and foresight that others can not even imagine exists and an almost reckless approach to danger, dangerous situations, and; yes, often the most dangerous individuals that live among us that thrive on seeing grief inflicted on good people! Yes, the Defendant once had a great public reputation that was enhanced by his ability to see and speak out publicly on critical water supply issues nationwide that had gone undiscovered and/or in certain instances had been conveniently ignored by the powers that be due to concerns over lower profit margins. Yeah, but don't for a single minute believe that it's so awesome to be afflicted like me. There's always a heavy price to pay for being the harbinger of the truths that lie dormant for years. Like the Flint, Michigan lead crisis for instance. Here is true information and true belief on the secrets of Flint that have laid buried deep for more than twenty years now. ? The real information and belief of how easily the Flint crisis could have been prevented if the proper actions had been taken by the U.S. EPA after the Defendant's courageous presentation in Washington DC where the Defendant provided simple and not too costly solutions that took on the power mongers behind the nation's largest water suppliers despite threats from the CEO and chief legal officer of the American Water Works Association (AWWA); hardly the good guys in the white hats that they purport to be. Threats that "Messer, you will never work in the public water supply industry again if you present what we expect you to present".  Searching for the truths of Flint are much like finding the real truths of the Plaintiff which are right there in the public domain of the internet readily available to anyone who knows how to search for the truth. Very simple for Flint, just search the correct combinations of Messer, CT DPH, and/or Washington D.C. summit on lead in public schools drinking water supplies.

34) <u>Deny</u> - Wake up people. Just like the Defendant spoke to the truth and the courage it often takes to search for the real truths of most anything. So Plaintiff side of the suit equation cut out the BS, the dirty lies, the narcissistic sociopathic fantasies of the Plaintiff, the half-truths, the deluded truths, and the wicked exaggerations like this one smack dab in front of us here. C'mon, facts are simple here, very simple. The Plaintiff was nothing more than a glorified Gal Friday type; not even a secretarial type. The Plaintiff resided in my home for more than two years. The Defendant observed day in and day out assignments and work duties. The Defendant had three primary work duties as follows: rental cars for presenters, hotel rooms for presenters and their families, and scrambling to get the owner of the business concert tickets with meet and greets at the show. Cute, those NSP grandiose exaggerations aren't they eh? But let's not start comparing working closely in the professional community to get the occasional extra family members of conference presenters in on the action to working closely in the professional community to create and market programming! Ahh you make me laugh, Plaintiff! So let's not start turning bat boys into Ken Griffey Jr. until they have grown up, paid their dues, and earned their stripes in AA and AAA ball. The Defendant is brutally honest and fair so he has absolutely no problem stating that the Plaintiff was excellent in getting the best rentals for the presenters and getting extra family members in on what essentially is a 'professional' vacation for conference presenters. So give the Plaintiff kudos for that work but the Defendant is not going to believe anyone who states a belief that wish a narcissistic sociopathic, habitual liar, serial cheater, mental health abuser, assault and batterer of a mentally disabled person, sexually deviant, amateur porn star, etc ….was one of the individuals involved in any aspect of the only mandatory training for that is required to license or relicense physicians including owning and being in charge of the entire program. The Plaintiff is used to being the harbinger of the truth which sometimes is bad news so the truth here is simple. Oftentimes in our society certain specific qualifications, actions, personal choices, etc. dictate whether or not a specific individual has the qualifications to meet the minimum requirements of a position. Those qualifications are many fold be it education, training courses, certifications, licenses, clean criminal records, high moral standards, respect for societal mores, etc. We, the public, hold the nation's physicians to the most strict standards that exist including good character and high moral standards. The Defendant worked at a very high level at the State of Connecticut Department of Public Health for more than 30 years. The Defendant observed those strict standards for physicians and the vast majority of other health professionals in play day in and day out. The Defendant was also privy to the DPH's monthly report in regards to actions taken against physicians including the permanent loss of a state medical licensure for severe offenses. The Defendant will end this item with a couple simple statements. One statement is in thirty years the Defendant never saw a compilation of charges and/or offenses that even came close to the known physically evidenced actions of the Plaintiff. Not even close, nowhere close in actuality. Therefore, all relevant public health professional experience thrown aside, the Plaintiff would not have been a good citizen if he did not report what he had discovered to the licensing authority. At that point it is their decision as to who to license or who not to license or even who to license with conditions or provisional approvals. That certainly is a board decision but even the very best licensing boards rely upon public information to make most decisions.

35) <u>Deny</u> - No, no, no, no, no, no invest for Defendant. Okay, does anyone else notice a trend here or just me? The Defendant would have to look back to double and triple check which ain't happening as the Defendant has spent way too many days and

worked through the entire night on this BS already. So here's the trend; and I am rather certain the Defendant is 100% correct without checking, there is only one charge, statement, whatever here that has been 100% true and that one is really mundane being that I did reside in Connecticut when I first met the Defendant. So that's not too good at all is it? It's most certainly worlds away from the truths that this Defendant seeks day in day out 24/7. So everything else is either outright baseless lies (most), half truths (a couple), deluded truths (a couple), delusions (many). Again not good I think I remember the Defendant calling this one before he read any of the narrative here. Any hoot, I'm going to classify this one as a deluded truth just edging out a half-truth because the Defendant believes that after living a life littered through with lies and deceptions this Plaintiff actually believes some delusions. What we have here .... is a failure to communicate (Axl Rose - Civil War); so what actually occurred here is totally omitted in the Plaintiff's truths regardless because this one in particular breaks the back of her desperate claim that the Defendant caused her business to fail. Not. Own it Defendant because this is the exact point where the Defendant and the Plaintiff had a coincident happenstance communication in which the Defendant inquired as to how the business was going? The Plaintiff responded that she had to cancel her very first scheduled training at the last minute due to insufficient funds to cover the facilities. Oops that is not good, not good at all Plaintiff. So where do you stand now? Well it looks like the second scheduled training might have to be cancelled too. Wow. That's really bad to put out a bunch of very busy public health professionals, presenters and attendees. And for a new start up business to do that twice and for their first two scheduled training .... well that's a death toll for certain. So the Defendant being an over caring, kind, gullible, easily duped fool naturally followed up with "how much are you short"? The Plaintiff pondered for a few seconds before stating a bit over $20,000. Ooh wowsa. The Defendant  normally does not have any savings but given the recent sale of his log cabin in Connecticut the Defendant had around $22,000 in his checking account. The Defendant stated to the Plaintiff well this issue is going to be a make or break issue for your business or any start up business for that matter. So the Defendant stated I can give consideration to providing a short term loan to you but it would have to be really short term. The Plaintiff then responded something to the effect of well a lot of people are investing in my business. You should invest in my business. Defendant responded no I don't want to invest in your business nor would it be prudent right now for me to invest in your business. So quite obviously, the Defendant never expressed any interest in investing in the Plaintiff's business. Quite to the contrary when the Plaintiff pressed the Defendant on investing the Defendant clearly indicated absolutely no interest in investing. He did consider a short term loan to at least help assure the business was not dead on arrival. The Defendant eventually decided against such a loan after counsel with his children and the Defendant did not observe any confidence from the Plaintiff in regards to paying back $20,000 in the short term.

36) Deny - No, no, no that is impossible and an obvious false date made up by the Plaintiff to support her false claim that the Defendant is responsible for destroying her business when in fact its destiny was sealed by the Plaintiff herself when making the two last minute cancellations of the first two scheduled training seminars in Key West, Florida and Bar Harbor, Maine. Both of those failures were prior to the falling out already mentioned. The failed conferences obviously were scheduled to occur before the Plaintiff's assault on the Defendant. The Defendant would have not considered providing a short term loan of $20,000 so the Plaintiff could have adequate funding to hold her second scheduled conference which ultimately was cancelled very late like the first scheduled conference was earlier in the Calendar year.

37) Deny - Plaintiff sought a protective order in an attempt to try to effectively silence the Defendant in regards to the truths that he discovered as detailed above in #36. The protective order sought in Illinois was all based  completely on lies, slander, and libelous statements made in regards to the Defendant. Said protective order was sought only as a last ditch attempt to silence the Defendant after many other types of attempts including physical assaulting and battering the Defendant on Tuesday, February 21st, 2023 while he was driving in rush hour traffic on I-4S towards Tampa for an appointment with the Defendant's vascular surgeon. See attachment #1 for photos of the Defendant after the Plaintiff's assault. Plaintiff was charged by the State of Florida with assault and battery. The Plaintiff's assault did not intimate the Defendant so the Plaintiff filed for a protective order with bogus information except for one fact. The Plaintiff admitted to striking the Defendant which resulted in the Florida assault and battery charges.

38) Deny - Ludicrous the Defendant has never physically threatened the Plaintiff or anyone else in his life for that matter. The Defendant has never struck anyone in his entire life. The Defendant had never been struck by anyone until the Plaintiff struck him three times in the face on February 21st, 2023.

39) Lack Sufficient Knowledge to Admit/Deny - Unknown to the Defendant but highly unlikely based upon information and belief.

40) Lack Sufficient Knowledge to Admit/Deny - Unknown to the Defendant but highly unlikely based upon information and belief. Moreover, it is incredibly ludicrous that some previously unknown male, and a prospective client at that, would even broach the subject of porn sites with the female owner of any business let alone a prospective client interested in an educational program through her business. Upon information and belief, it is highly likely that the Plaintiff's business was even in an active mode on or about October 28, 2023 given that upon information and belief the Plaintiff had never sponsored a successful conference. The Defendant requests complete information on the status of the Plaintiff's business such as successful events, educational programs offered because upon information and belief the Defendant finds the charge here to totally lack any credibility of all. How could the Plaintiff have developed educational programs if she didn't even have adequate funding to hold the two previously cancelled CEU training programs? And, moreover, who was going to be the instructor for said educational program and where was the program going to be held given the Plaintiff lacked adequate funding to pay for facilities for CEU training programs that likely could have had 50 or more openings for paying attendees whereas for educational programs the paying attendees would like be less than 10-20. Obviously, all this information is a figment of imagination of a habitual liar and narcissistic sociopath who wouldn't know the truth if it hit her!

41) 39) Lack Sufficient Knowledge to Admit/Deny - Unknown to the Defendant but highly unlikely based upon Information and belief. If anyone at all actually called her it is much more likely that the man was one of her NSA sex pals that hang out on porn sites all day anyway.

42) Deny - The Defendant not only never posted such photos to any sites anywhere; it would have been impossible for him to do regardless because the Defendant had not had any of such photos or videos referenced here since late November 2019/early December 2019 when the Plaintiff removed all said materials from the Defendant's desktop and supposedly deleted all materials permanently. The Defendant finds that fact very questionable now unless another person(s) did hack the materials from the desktop sometime in the general time period of May 2018 when any photos or videos were first taken and stored on the antiquated desktop to late November 2019/early December 2019 when the Plaintiff purported to have permanently deleted all such materials. The only photos that the Defendant did come across anytime after late 2019 were a few print copies of the "special gifts" that the Plaintiff so loving blessed him with. Those couple photos were the photos returned to her family when the Defendant discovered that the photos were taken by other male suitors and used as a very effective tool to mess with the Defendant's mental health conditions. The Defendant also found some fully clothed innocent photos when sitting through boxes of family photos to distribute to his children. Except one of those photos that the Defendant thought to be innocent and were stored among other family photos was not so innocent at all. The photo was of the Defendant sitting on the bed fully clad in a thick blue bathrobe intently staring at her cell phone. Just as he was about to toss that photo away with the other innocent photos of the Plaintiff a thought crossed his mind of what exactly was the Plaintiff so engaged in staring at. So curiosity killed the cat once again because upon blowing the photo up the Defendant discovered that my oh my the Plaintiff was actually thoroughly engaged staring at was three photos of herself at the bottom of her phone that had been sent to her by someone. Most likely those three photos were sent to the Plaintiff by the same unknown male that the Plaintiff was giving a blowjob to in each of the three photos; two photos pictured the Plaintiff looking up at the recipient of the service that the Plaintiff was providing to him in August 2018 just one month after moving into the Defendant's residence with her unemployable son Stephen. The third photo pictured the Plaintiff hard at work for that particular job.

43) Lack of Knowledge to Admit/Deny - The Defendant has no knowledge of the photos, what they may be, and/or where said material may be posted.

44) Lack of Knowledge to Admit/Deny - The Defendant has no knowledge of that statement; and, is not even aware of what specific materials are being referred to in the statement.

45) Deny - The Defendant has clearly stated several times now that he did possess any such materials after late 2019 when the Plaintiff removed all such material from the desktop and all associated hard drives. So upon information and belief, the last person to possess said materials is the Plaintiff herself. So obviously, the Defendant was the only person who could have had such materials because said materials had not been in his possession for over four years by October 28, 2023. Quite contrary to the Plaintiff's charge, facts are that the Plaintiff was the ONLY person who could have had such materials in possession as the Plaintiff was the very last person to have accessed any and all such materials when she claimed to have deleted all such materials from the desktop and associated external hard drives while the Defendant was absent from the residence for an extended hospitalization. Then still without returning home, the Defendant underwent a subsequent rehabilitation in a facility chosen for him by the Plaintiff. The facility was a really dreadful, depressing place where essentially the entire clientele were people of no other means sent there to die. As soon as the Defendant was committed the Plaintiff took off for an extended vacation in Florida. The Defendant immediately realized in the half hour spent at the front desk while the Plaintiff filled out legal paperwork and insurance forms that being committed there was going to have a considerable negative impact on his mental health conditions. The Defendant pleaded with the Plaintiff not to leave him there and to find a much more appropriate rehabilitation facility for him. The Plaintiff told him she didn't have time for that because she was leaving immediately for a trip to Florida. As the Plaintiff was leaving the Defendant shouted "F-ck You! If you really loved me you wouldn't leave me in a place like this!" and the Plaintiff just continued walking down the hallway without even looking back. When the Defendant finally did return home and the Plaintiff informed him that she had deleted all photos and videos that were ever taken during the 'romantic' relationship that had ended several months before the Plaintiff was the last person to access said materials. That same night given that removing and permanent deleting all materials was supposedly what the Plaintiff desired; and the Defendant did not want the materials either, the Defendant deleted any and all materials on his cell phone that had not been downloaded to the desktop yet. Then the Defendant went to talk to the Plaintiff with the cell phone and a pad that had a few such photos on it. The Defendant then proceeded to delete any photos from the pad while the Plaintiff observed and gave his cell phone to the Plaintiff so that she could observe for herself that there were no photos or videos on it either. The Defendant told the Plaintiff that he had done that to put her mind at ease that no such materials existed after remembering that there were a very small amount of such materials on his cell phone and pad which were the only other devices that the Defendant owned that were capable of taking and/or storing photos or videos. The Plaintiff thanked the Defendant and he thought that was the end of the story but he did wonder why that had become a matter of such concern for the Plaintiff coincident with the Defendant being absent from the home for an extended period. The Defendant now has absolutely no doubt that the Plaintiff kept copies of the photos and videos that supposedly were all permanently deleted; of course except for the very small chance said materials were hacked by an external party. The Defendant is not absolutely certain what the Plaintiff's original intentions were for keeping copies of said materials but he has no doubt the intentions were of a nefarious nature given all the other nefarious acts the Plaintiff committed against him. In closing, despite any original intentions of the Plaintiff, the Defendant has no doubt that after he discovered the Plaintiff's internet porn videos which unmasked the true nature and character of the Plaintiff; he followed through on assault charges with the State of Florida, and the Plaintiff's rip off business scheme to steal the presenters from her employer that fired her and start her own copy cat business to get 'rich' in her mind failed miserably all because of the Plaintiff's accords only; that the Plaintiff came up with this scheme as the ultimate vengeance for all the Defendant's perceived trespasses. So given that the Plaintiff was capable of sick, nefarious acts such

as having other sex pals take photos of her to send to her fiancee' as 'special gifts'; said Defendant has no doubt that the Plaintiff is more than capable of concocking such a wicked scheme in her twisted mind and like the twisted photos she acted on it.

46) <u>Deny</u> - detailed several times already

47) <u>Deny</u> - ditto

48) <u>Deny</u> - absolutely not as the Defendant has no such material to distribute

49) <u>Deny</u> - already stated that Defendant does not know where, when, or if Defendant attended school; and Defendant does not know Plaintiff's business phone number or even personal phone number now for almost three years because his daughter Brianna Her old told the Defendate to delete the Plaintiff's phone number and to never speak with her ever again.

50) <u>Lack of Knowledge to Admit/Deny</u> - do not know what material is being referred to.

51) <u>Deny</u> - Ridiculous, the Plaintiff is a severe narcissistic sociopath.

52) <u>Deny</u> - ditto #51

53) <u>Deny</u> - ditto #51 & #52 along with stated certainty that the Plaintiff should be evaluated by professionals or be requested to take a lie detector test because the s-it is way far beyond deep here.

54) <u>Deny</u> - ditto above plus not worthy of wasting more time on the BS incredulous charges. No wonder why the Plaintiff pleaded bankruptcy as even she had sense enough to realize these charges are way beyond typical slander or libelous statements. These charges are outrageous and way over the top. Plaintiff needs to realize that not everyone is in love and infatuated with her, not at all.

55) <u>Deny</u> - Totally BS the Plaintiff's educational services business effectively closed its doors long before the Plaintiff posted these materials of herself to the internet.

56) <u>Deny</u> - Absolutely ridiculous, the Defendant stopped caring about the Plaintiff over seven years ago and has NO interest in her sad and sorry life.

57) <u>Deny</u> - Plaintiff wrote to the regulatory agency for reasons already stated. Having worked in the public health field his entire professional career, it was the responsible thing to do for public health and safety.

58) Admit - see reasons already elaborated and request that Defendant take a lie detector test as will the Defendant if she does. The Plaintiff had a 'romantic' relationship with an 82 year old massage client, Carl Luffer (sp) who the Plaintiff had delusions that he was going to bequeath her one million dollars.

59) <u>Deny</u> - the Plaintiff absolutely joined Pornhub as HubbardDorisX and the Plaintiff is well aware that Defendant discovered such and screenshots from Pornhub were taken of all related actions in discovering that fact. For masseuse see Mr. Loofer example above

60) <u>Deny</u> - Ridiculous like doctors are going to search for such content and naturally the Defendant did not contact the Plaintiff in regards to said letter because he was legally prohibited from contacting her. Furthermore, the Defendant fully complied with all requests of the Plaintiff's bogus protective order.

61) <u>Deny</u>

62) <u>Deny</u>

63) <u>Lack of Knowledge to Admit/Deny</u> - Plaintiff sought such attention herself regardless.

64) <u>Deny</u>

65) <u>Deny</u>

66) <u>Deny</u>

67) <u>Deny</u>

68) <u>Deny</u>

69) <u>Deny</u>

70) <u>Deny</u>

71) <u>Deny</u>

72) <u>Deny</u>

73) <u>Deny</u>

74) <u>Deny</u>

75) <u>Deny</u>

76) <u>Deny</u>

77) <u>Deny</u>

78) <u>Deny</u>

79) <u>Deny</u>

80) <u>Deny</u>

81) <u>Deny</u>

82) <u>Deny</u>

83) <u>Deny</u>

84) <u>Deny</u>

85) <u>Deny</u>

86) <u>Deny</u>

87) <u>Deny</u>

88) <u>Deny</u>

89) <u>Deny</u>

90) <u>Deny</u>

91) Deny
92) Deny
93) Deny
94) Deny
95) Deny
96) Deny
97) Deny
98) Deny
99) Deny
100) Deny
101) Deny
102) Deny
103) Deny
104) Deny
105) Deny
106) Deny
107) Deny
108) Deny
109) Deny
110) Deny
111) Deny
112) Deny - Bold lie, the Plaintiff was forced to close her business because of a lack of funding available to cover costs of a training seminar. The Plaintiff canceled her first two scheduled training seminars at the last minute. The Plaintiff had actually spoken to the Defendant to tell him about her dire situation and she asked the Defendant if he was willing to invest in her business. A business that for all practical and true reasons was dead on arrival when the Plaintiff and Defendant discussed the matter. The Defendant went on to tell the Plaintiff that if she canceled a second seminar at the last minute, and the Plaintiff did, that any dreams of owning her own business were over. Those are the true facts. Given the lack of funding and thinking that she would be able to cover the facility costs with early registrations was really poor decision making as the Plaintiff would have been much better served by waiting another six months to a year to schedule her first two training seminars. The Plaintiff created the reasons that her business closed its doors, this other BS is just what it is total BS, more lies distortions, and deluded 'facts' of the Plaintiff.
113) Deny
114) Deny
115) Deny
116) Deny
117) Deny
118) Deny
119) Deny
120) Deny
121) Deny
122) Deny
123) Deny
124) Deny
125) Deny
126) Deny
127) Deny
128) Deny
129) Deny
130) Deny
131) Deny
132) Deny
133) Deny
134) Deny
135) Deny
136) Deny
137) Deny - Defendant did not publicly disclose the Plaintiff private facts. It would be impossible for the Defendant to disclose the Plaintiff's private facts because the Defendant never knew the Plaintiff's private facts. The Defendant never knew the Plaintiff's private facts ever; not when in a 'romantic' relationship, not when in a platonic relationship, or not now as a matter of true fact. As noted prior; the Defendant successfully tackled long standing public water supply situations that had been deemed 'impossible' by his predecessors. Not being a braggard, the  Defendant faced and  took on the 'impossible' from birth. The Defendant was born into abject poverty, systematic verbal abuse and constant put downs by an alcoholic, adulterous father in a wholly dysfunctional family situation; and then spent his formative years in trailer park terror during the turbulent late 1960's. All that impossible aside, the

Defendant never even dreamed in his worst nightmares that his fate would be to cross paths with the likes of Plaintiff Doe. Yes, this Defendant well familiar with impossible and improbable but never broken by anything up until April 17, 2018. The day the Defendant's life was forever, irreversibly changed for the worst by the improbable, almost impossible 1 in 200 chance meeting with an extreme narcissistic sociopath, the Plaintiff.  It is impossible The Defendant

Defendant does not know where the Plaintiff currently resides. The Defendant has had no contact with the Plaintiff in almost three years. The Defendant's last known residence of the Plaintiff was in Normal, Illinois. The Defendant wonders why the Plaintiff in this Civil Action would request anonymity? Defendant's concern stems from facts that are verified by solid physical evidence that the Plaintiff participated in an extremely graphic homemade sex video of her own free will and violation at least 12-18 months prior to even knowing the Defendant. That video was then posted to the internet for public viewing. Upon knowledge and belief, at least as of January 2023 when the Defendant discovered the Plaintiff's graphic sex video, two different distinct versions, the original video and a voice edited video after the fact, were still posted on several internet porn sites. Furthermore, the Plaintiff took absolutely no measures to protect her anonymity or to conceal or to even obscure or blur out her face or other distinct identification features prior to participating in the video. Quite to the contrary, the Plaintiff completely pinned back her hair so as to ensure that the Plaintiff's entire face and associated facial expressions while performing could be viewed throughout the entire video. Moreover, the Plaintiff also did not take any such measures to protect her anonymity prior to the posting of said videos to the internet for public viewing. It's ironic that totally unaware at the time that the Plaintiff's graphic video existed, the Defendant stated on several occasions that it would be much more exciting if the Plaintiff's face could be observed during romantic relations.  Rapidly rising suspicions regarding the Plaintiff's true character and pretty much every single thing that the Plaintiff had told the Defendant about herself, her past, and her total lack of sexual experience history started almost immediately after the Plaintiff moved into the Defendant's residence in Ashford, CT on July 3rd, 2018. The Defendant's suspicions were valid and resulted from the Plaintiff's constant 'off-the-wall' unsolicited  sexually related comments such as overhearing the Plaintiff state to the Defendant's daughter "Why is it that a man who has sex with tons of women is a stud; but a woman who sex with tons of men is a slut?" A most virtuous woman like the 'dream' woman that the Plaintiff created for the Defendant most likely would not even think of such matters let alone state such matters to her fiancee' daughter. Given that the Defendant started a list that compiled the vast majority of the Plaintiff's 'odd ball' comments and the associated dates. One date was the only time in the entire more than a year-long  'romantic' relationship when the Plaintiff did pull her hair back for the Defendant. That was Tuesday, April 9th, 2019 when the Plaintiff looked up at the Defendant and stated verbatim "I pulled my hair back so it won't get in my face so much." The third, and final time, that the Defendant ever observed the Plaintiff with  her hair pulled back and pinned was in another homemade porn video created by the Plaintiff and a Hamilton Ontario man that she met on Pornhub under the pseudonym screen name HubbardDorisX in late Spring 2019 while still technically engaged to the Defendant.